Nelson, J.,
delivered the opinion of the Court.
During the late civil war, and in the month of January, 1863, the plaintiff, who was then a citizen of Haywood county, in company with one Sammons, took his wagon to Haile’s point, on the Mississippi river, and there procured certain family supplies, for the use of his own family, consisting *343 of nails, salt, candles, leather, and tar, amounting in value to about the sum of $128.50. On their way home, and just after they had crossed the Iiatchie river, a skirmish, or battle, took place between the third Michigan Cavalry and certain Confederate troops, commanded by Colonel Richardson, in consequence of which the plaintiff and his associate, who also had certain goods in the wagon, left the wagon and its contents in the evening.
Early the next morning plaintiff and Sammons discovered the articles sued for in the smoke-house of defendant’s intestate, but the wagon had been burned, and one of the mules attached to it killed. Plaintiff then claimed the articles, and witness Sammons, also, told Lowry, the intestate, that they were the property of plaintiff, but Lowry “pulled out” a bill of sale, which he said was from the third Michigan Cavalry, and claimed the articles, for which he said he had paid fifteen dollars, and refused to give them up. The plaintiff had been a soldier in the Confederate army, in the Eall of 1861, but only remained in it a short time, and had. been at home about nine months, and was engaged in agriculture, and not in any way connected with the army at the time of the seizure and conversion of his goods. It is also shown, by parol, that all trade was prohibited between the section of country in which plaintiff' lived and the Mississippi river; that plaintiff procured a pass, in the first instance, from Col. Richardson, to Haile’s *344 point, for Ms supplies, and went back for them after the skirmish; but the lines of occupation by the two contending armies, or by the parties to the skirmish, are not, otherwise, shown in evidence. The defendant was permitted to prove, in opposition to the objection of plaintiff, that salt, and most of the articles in plaintiff’s account, were contraband of war. The Court below refused to charge the jury as requested by plaintiff, that the bill of sale by the soldiers to the defendant’s intestate should have been made by some one properly authorized by the Government of the United States to take charge of and sell the goods. The charge of the Court was as follows, viz.: “If the jury find that the goods in controversy were captured by the United States forces, in a battle with Confederates, that the owner thereof did not make demand thereof within twenty-four hours thereafter, then the title of the owner would be divested, and the same, being prize of war, would enure to the benefit of the captors, and if they sold the same to the defendant’s intestate, his title would be good, and he would be. entitled to a verdict. If the jury find the articles charged in this account were contraband, and so declared by the laws of the United States in the laws of war, then the capture of same by the United States forces, and the title to the same, would vest in the captors, and they could communicate a title to defendant; and should the jury so find, the defendant would be entitled to a verdict.”
It appears from the record of this cause, which *345 came up to this Court at a former term, on appeal, by the defendant, from a judgment in plaintiff’s favor for $115.40, that the suit was commenced, by warrant, before a Justice, on the 2nd of December, 1865, in a plea of debt due by account under two hundred and fifty dollars; that the judgment of the Justice was in favor of the plaintiff, and “affirmed” by the verdict of the jury; that the judgment thereon in the Circuit Court was here reversed, and the cause remanded. On the last trial, the jury found “the issue” in favor of the plaintiff, and “assessed his damages” at $19.50, which, we conjecture, was for a bushel of salt loaned by plaintiff to defendant, in 1864, and charged in .his account at fifteen dollars, and which, with interest, would amount to about the sum found by the jury. It may be fairly inferred that nothing was allowed by the jury for the articles taken from plaintiff’s wagon. Prom the last judgment the plaintiff prosecutes this appeal, and we are of opinion that there are several errors in the proceedings in the Circuit Court.
1. A recent American author on international law, says that, “by the term ‘contraband of war,’ we now understand a class of articles of commerce which neutrals are prohibited from furnishing to either one of the belligerents, for the reason that, by so doing, injury is done to the other belligerent;” and he treats of the subject, chiefly, in its relation to commerce upon the high seas: Hal. Int. Law, 570, 592. "What articles are contraband of war has not been ascertained *346 or accurately defined, by publicists. "Wheaton says, that “the almost unanimous authority of elementary ■writers, of prize ordinances and treaties, agrees to enumerate, among these, all warlike instruments, or materials, by their own nature, fit to be used in war. Beyond these, there is some difficulty in reconciling the conflicting authorities derived from the opinions of public jurists, the fluctuating usage among nations, and the texts of various conventions designed to give to that usage the fixed fonn of positive law:” Lawrence’s Wheat., 2d ed., 768, 772. Kent, in treating of warlike stores and other arti-ficies, which are directly auxiliaries, and of the commerce of neutrals with belligerents, says: “ Such goods are denominated contraband of war; but in the attempt to define them, the authorities vary, or are deficient in precision, and the subject has long been a fruitful source of dispute between neutral and belligerent nations:” 1 Kent’s Com., 6th ed., 133. He says further, that “ the. modern established rule is that provisions are not, generally, contraband, but may become so, under the circumstances arising out of the particular situation of the war, or the condition of the parties engaged in it:” Ibid, 138, 139. Halleck says: “It is universally admitted that provisions are not, in their own • nature, contraband but proceeds to show that, if adapted to military purposes, they may become so by their special destination and intended use; having stated in a previous section, that there is a great diversity of sentiment as to what may, or may not, be contra *347 band: Hal. Int. Law, 587. Without referring to foreign authors, or multiplying references to Ameri-ican, it may well he doubted whether the facts presented in the record, raise any question whatever as to what is contraband of war; and it is certainly beyond all question that his Honor, the Circuit Judge, erred in allowing the witness to say> to the jury, “I think salt was a contraband,” and in leaving it to the jury to decide for themselves, .and without instructions to guide them, “ whether the articles charged in the account were contraband, and so declared by the laws of the Hnited States in the laws of war.” If Grotius, Vattel, Bynkershoek, Phillimore, and other foreign authors have, like our own, been unable, definitely, to settle the vexed question as to what is contraband of war, and if, as is the case, the laws of the Hnited States and the laws of war do not, with precision, determine it, a witness and a jury, with the largest presumption in favor of their intelligence, can scarcely be supposed to comprehend the question by intuition, or be regarded as the most appropriate judges in its final determination.
2. The court below should have instructed the jury that the third Michigan cavalry had no authority to execute to defendant’s intestate, a bill of sale for the plaintiff’s- property. Whatever may have been the practice of soldiers in the late civil war, it is expressly ■ said, that, “ The laws of the Hnited States and the general laws of war authorize, in certain cases, the seizure and conversion of *348 private property for tlie subsistence, transportation and other uses of the army; but this must be distinguished from pillage, and the taking of property for public purposes is very different from its conversion to private uses. All property lawfully taken from the enemy, or from the inhabitants of an enemy’s country, instantly becomes public property and must be used and accounted for as such:” See Revised IT. S. Army Regulations, 1863, see. 21, p. 512; Leiber’s Instructions, paragraphs 37, 45; General Orders, 1868, pp. 70, 72.
3. If the property of plaintiff was lawfully captured, as it might be under the most rigid laws of war, the most important question in the case is, whether the United States acquired, under the circumstances, any title to the property? As the late civil war was a public war, and governed by the law of nations, the question involves the jus post-liminii, as recognized by that law. Without tracing the doctrine to its origin, in the Roman law, or noticing the distinction as to real or personal property, or stating the qualifications under which, in its broadest application, it is received by different nations, we extract and adopt, as applicable to this case, the principle as concisely stated by Chancellor Kent. lie lays down the rule to be, that, “ In a land war, movable property, after it has been in complete possession of the enemy for twenty-four hours, (and which goes by the name of booty, and not prize,) becomes absolutely his, without any right of postliminy in favor of the owner:” 4 Kent’s *349 Com., 109. But, “when property, taken by the enemy, is recaptured or rescued from him by the fellow subjects or allies of the original owner, it does not become the property of the re-captor or rescuer, as if it had been a new prize, but it is restored to the original owner, by the right of post-liminy, upon certain terms:” Ibid, 107. Halleck says that, “ naturally, property of all kinds is «recoverable by the right of postliminy, and there is no intrinsic reason why movables should be exempt from the rule; * * * and the title of the former owner to all booty is considered as completely divested by a firm possession of the captor for twenty-four hours:” Hal. Int. Law, 870. Yattel declares that, “movables, or booty, are exempted from the right of postliminium, unless re-taken from the enemy immediately after his capture of them, in which case the proprietor neither finds a difficulty in recognizing his effects, nor is presumed to have relinquished them: Ingraham’s Yattel, 1865, p. 393, § 209.
Applying these principles to the case at bar, we hold that if the plaintiff’s property was seized or captured by soldiers of the Hnited States during the late war, the soldiers had no right to dispose of it as their own property; that the title was not vested in the Hnited States, unless it ■clearly appears that the property was held hy their soldiers for twenty-four hours; that, if the soldiers pretended to sell it without authority, and it was left in possession of the defendant’s intestate to *350 hold as Ms own, and not as the property of the United States, and was never afterwards claimed hy the United States, this was an abandonment of their claim; that defendant’s intestate was a trespasser in thus receiving the property from the soldiers; that if the plaintiff demanded it- within twenty-four hours, and the defendant refused to deliver it, such demand and refusal amounted to a conversion of the property, as the title thereto never was vested in the United States; arid that, under the provisions of the Code, the plaintiff’ might, lawfully, waive his right to sue for the trespass, and maintain his present action, in which, if he establishes his right, in a new trial before a jury, he may recover the value of the property sued for,, with interest. thereon.
Keverse the judgment, and remand the cause.